# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF OKLAHOMA

PRE-PAID LEGAL SERVICES, INC.,      )
     )
     )
     Plaintiff,      )
     )
     v.      )      No. CIV-06- 019-JHP
     )
LORIE HARRELL and LES HARRELL,      )
     )
     Defendants and      )
     Third-Party Plaintiffs,      )
     )
     v.      )
     )
HARLAND STONECIPHER,      )
     )
     Third-Party Defendant.      )

# FINDINGS OF FACT AND CONCLUSIONS OF LAW

     The Plaintiff, Pre-Paid Legal Services, Inc. ("Pre-Paid"), is an Oklahoma corporation which markets legal expense contracts throughout the United States. These contracts are referred to as memberships, and are offered both individually and through groups. Pre-Paid has established a marketing network consisting of independent contractors who earn commissions on the sales of the legal expense contracts. Pre-Paid also has employees who function at various levels within the company. Defendants and Third-Party Plaintiffs, Lorie Harrell and Les Harrell ("the Harrells"), were both employees and independent contractors of Pre-Paid. Third-Party Defendant, Harland Stonecipher ("Stonecipher"), is President and Chief Executive Officer of Pre-Paid.

     This case was originally filed on November 9, 2006, in the District Court of Pontotoc County, Oklahoma. Pre-Paid alleges the Harrells marketed Pre-Paid memberships and

recruited and trained sales associates across the United States and have been compensated by Pre-Paid for such services pursuant to Agreements and certain amendments to the compensation provisions of the Agreements. As part of these Agreements, Pre-Paid alleges the Harrells acknowledged their duty to maintain trade secrets of Pre-Paid, and confirmed their consent to all non-competition and non-solicitation terms as well. Pre-Paid argues the Harrells have recruited or attempted to recruit Pre-Paid associates to another company and have used their knowledge of trade secrets in violation of the Agreements and to the detriment of Pre-Paid.

The case was removed to this Court on January 13, 2006. The Harrells filed a Third-Party Complaint on the same date. An Amended Third-Party Complaint and Counterclaim were later filed January 27, 2006. A non-jury trial was held on May 30, 2007 through June 5, 2007.

## FINDINGS OF FACT

### A. RVP Agreements

1. On March 31, 2003, Les Harrell entered into a Regional Vice President of Marketing Employment ("RVP") Agreement with Pre-Paid. (Plaintiff's Ex. 9).

2. On October 31, 2003, Lorie Harrell entered into an identical RVP Agreement with Pre-Paid. (Plaintiff's Ex. 12).

3. Paragraph 9(i) of both RVP Agreements establishes that the "identity and success of sales associates and/or key personnel" are trade secrets and confidential information. Plaintiff's Ex.9, at ¶9(i); Plaintiff's Ex. 12, at ¶9(i).

4. Paragraph 9.1 of the RVP Agreements provides that, upon termination, all trade secrets and confidential materials of Pre-Paid are to be returned to Pre-Paid or destroyed. Plaintiff's Ex. 9, at ¶9.1; Plaintiff's Ex. 12, at ¶9.1.

5. The RVP Agreements also include a non-competition and non-solicitation clause. Paragraph 10 of the RVP Agreements provides, in part:

Non-competition and Solicitation.  Employee agrees that during the term of this Agreement and for a period of three (3) years following termination of this Agreement for any reason by either party, the Employee shall not, without the prior written consent of the Company:

. . .

(b) directly or indirectly solicit, call upon or otherwise contact or offer products or services to, then existing members, sales associates, attorney providers, or other customers or suppliers of the Company of the same type as offered through the Business, or take any action which would cause the termination or curtailment of the business relationship between the Company and any such persons; and

(c) directly or indirectly solicit, entice, persuade or induce any individual who presently is, or at any time during such period shall be, an employee, sales associate or member of the Company or subsidiary or affiliate of the Company, or any of their respective successors, to terminate or refrain from renewing or extending his or her employment, association or membership with the Company or subsidiary or affiliate of the Company, or any of their respective successors, or to become employed by or enter into a contractual relationship with Employee or any business with which Employee is affiliated.

Plaintiff's Ex. 9, at ¶10; Plaintiff's Ex. 12, at ¶10.

6. In Paragraph 11 of the RVP Agreements, Les and Lorie Harrell acknowledged that Pre-Paid would suffer irreparable harm if they violated the terms of the RVP Agreement. They also acknowledged that Pre-Paid "may enforce the terms of [an RVP] Agreement by injunction or specific performance and may obtain any other appropriate remedy available in equity..."  Plaintiff's Ex. 9, at ¶11; Plaintiff's Ex. 12, at ¶11.

7. In Paragraph 13 of the RVP Agreements, Les and Lorie Harrell agreed that disputes arising under the RVP Agreement would be settled by arbitration, but further agreed that Pre-Paid could seek injunctive relief in this Court. Paragraph 13 of the RVP Agreements provides, in part:

> [T]he Company shall be entitled to seek a restraining order or injunction in any court of competent jurisdiction to prevent any continuation of any violation of Sections 9 or 10 hereof as contemplated by Section 11. Employee consents and agrees that any such action may be brought in the location of the Company's principal office, Pontotoc County, Oklahoma, or in the United States District Court in which Pontotoc County is located and the Employee consents to the jurisdiction and venire [sic] of such court.

Plaintiff's Ex. 9, at ¶13; Plaintiff's Ex. 12, at ¶13.

8. Each RVP Agreement states that Pre-Paid "agrees to employ Employee as a Regional Vice President of Marketing of the Company commencing on the Effective Date and continuing until employment is terminated as provided herein." Plaintiff's Ex. 9, at ¶1; Plaintiff's Ex. 12, at ¶1.

9. The "Effective Date" of Les Harrell's RVP Agreement was March 31, 2003, when he signed the RVP Agreement. Plaintiff's Ex. 9, at ¶1. The "Effective Date" of Lorie Harrell's RVP Agreement was October 1, 2003, the date she signed the RVP Agreement. Plaintiff's Ex. 12, at ¶1.

10. During the trial of this matter, Defendants asserted for the first time that a 90-day probationary period invalidated the RVP Agreements' non-solicitation and trade secret provisions because those agreements were allegedly terminated before the 90-day probationary period expired. Lorie Harrell did not offer any testimony indicating when she discovered the 90-day probationary period may have applied to her. Tr. at 375, line 18 to . p. 380, line 5.

11. Defendants' principal support for a 90-day probationary period comes from Lorie Harrell's testimony about an alleged copy of a single page of an unproduced, unidentified Pre-Paid RVP manual. Defendants' Ex. 86. Defendants did not introduce at trial the entire manual from which the alleged 90-day probationary period originated, nor did Defendants provide any evidence to support the manual's date of publication or application to

Defendants' RVP Agreements. Tr. at 503, lines 7 to 12.

12. The RVP Agreements signed by the Harrells do not refer to, or incorporate the terms of, any RVP manual or a 90-day probationary period.  Plaintiff's Exhibits 9, 12.

13. Each RVP Agreement makes it clear that no terms outside the Agreement govern the relationship of the parties. Paragraph 16 of the RVP Agreements provides:

> This Agreement constitutes the entire agreement of the parties and supersedes all prior agreements relating to the same subject matter; provided, however, that any existing associate agreement between the Company and Employee shall continue in effect. In the event of any conflict between this Agreement and such associate agreement, the terms of this Agreement shall prevail.

Plaintiff's Ex. 9, at ¶16; Plaintiff's Ex. 12, at ¶16.

14. Keri Prince, General Counsel for Pre-Paid, testified she did not know of an RVP manual that provides for a 90-day probationary period before an RVP  Agreement's trade secret and non-solicitation provisions become effective. Tr. at 172, line 18 to p. 174, line 19.

15. Les Harrell terminated his RVP Agreement in early June of 2003 when he voluntarily resigned from Pre-Paid as an RVP and Associate.  Tr. at 401, lines 21 to 22; p. 440, lines 14 to 19; p. 444, lines 7 to 9; p. 513, lines 7 to 9.

16. Lorie Harrell worked more than 90 days as an RVP – from October 1, 2003 until January 2004.  Tr. at 370, lines12 to 17.  Therefore, any purported 90-day probationary period alleged by Defendants would not be applicable to her.

17. On January 6, 2004, Pre-Paid sent Lorie Harrell a letter advising her that Pre-Paid was terminating her employment as an RVP.  Tr. at 370, lines 15-17.

18. On January 7, 2004, Lorie Harrell sent an e-mail to Wilburn Smith at Pre-Paid, advising Pre-Paid that she was terminating her position with Pre-Paid.

19. On January 7, 2004, Pre-Paid sent a letter to Lorie Harrell, recognizing January 7, 2004,  as her "resignation date," but the letter – in an apparent scrivener's error, mistakenly states her resignation is effective November 19, 2003.  Plaintiff's Ex. 15.

20. Even if this were not a scrivener's error, the provision cited by Defendants as containing a 90-day probationary period places the end date of the 90-day period as the termination date, not an "effective date."

21. Contrary to Lorie Harrell's assertion at trial that her RVP Agreement was never valid because she did not complete a 90-day probationary period, she represented in earlier e-mail solicitations for Agel Enterprises ("Agel"), that she was a Pre-Paid Regional Vice President for several years. Plaintiff's Ex. 51; Tr. at 416, lines 5 to 12. Agel is another multi-level marketing organization.

### B. Associate Agreements

22. Les and Lorie Harrell admitted the execution of Associate Agreements with Pre-Paid. Tr. at 360, lines 1 to 9; p. 508, line 23 to p. 509, line 5.

23. The Associate Agreements signed by Les and Lorie Harrell included Policies and Procedures. Paragraph 11 of the Policies and Procedures provides for an associate's immediate termination for "revealing trade secrets, including the names of associates, members, or corporate accounts." Plaintiff's Ex. 2 at ¶11(C). Thus, Les and Lorie Harrell acknowledged that the names of Pre-Paid Associates were trade secrets.

24. Les Harrell terminated his status as an Associate in June of 2003, when he resigned from Pre-Paid. Tr. at 401, lines 21 to 22; p. 440, lines 14 to 19; p. 444, lines 7 to 9; p. 513, lines 7 to 9.

25. Lorie Harrell's Associate Agreement was placed on hold in January 2004 when Pre-Paid learned that she may have been attempting to recruit Pre-Paid associates to Positive Return, another multi-level marketing company. Plaintiff's Ex. 13; Tr. at 361, line 13 to p. 362, line 3; p. 365, line 21 to p. 366, line 1.

### C. 2004 E-mail Agreement between Lorie Harrell and Pre-Paid

26. In August 2004, Lorie Harrell requested that Pre-Paid negotiate to allow her to return to Pre-Paid. Pre-Paid agreed to negotiate and allow her to return only under certain

conditions. Plaintiff's Ex.34, 35. Pre-Paid had previously placed Lorie Harrell's Associate Agreement on hold due to her activities with Positive Return. Plaintiff's Ex. 13.

27. On September 7, 2004, Keri Prince of Pre-Paid offered to reinstate Lorie Harrell's Associate Agreement and remove her A-1 Marketing account from hold status if she agreed to six terms which were specifically set out in an e-mail. Plaintiff's Ex. 36. Later that afternoon, Lorie Harrell accepted the terms of Pre-Paid's offer when she sent an e-mail to Keri Prince stating "I am in agreement." Id. This offer and acceptance created a valid contract based on the written terms and conditions set forth in the e-mail ("the E-mail Agreement").

28. Pursuant to the terms of the E-mail Agreement, Lorie Harrell specifically agreed that "[a]ll non-competition and non-solicitation terms previously set forth in the RVP Agreement (and still binding) are reinstated and will be binding for three years from today's date." Plaintiff's Ex. 36. Therefore, Lorie Harrell's non-solicitation provision under the E-mail Agreement remained in effect until September 7, 2007.

29. Defendants asserted at trial that Lorie Harrell sent another e-mail on September 8, 2004, stating her acceptance did not include certain non-competition and non-solicitation provisions. Keri Prince testified she did not remember receiving the September 8, 2004 e-mail. Tr. at 250, line 24 to p. 252, line 18. In any event, Lorie Harrell's e-mail on September 8, 2004 was in response to an e-mail sent by Keri Prince on September 3, 2004, in which Prince proposed a five-year non-competition and non-solicitation period. Defendants' Ex. 43; Tr. at 69, line 4 to p. 70, line 6. Lorie Harrell's e-mail on September 8, 2004, was not significant because both parties had moved beyond the earlier, five-year negotiations; and they had instead agreed to a three-year non-competition and non-solicitation period on September 7, 2004. Plaintiff's Ex. 36. The subsequent e-mail does not change the fact of the prior offer and acceptance.

30. Pre-Paid and Lorie Harrell operated under the E-mail Agreement until June 2005. During that time, Lorie Harrell submitted business, and Pre-Paid released money to her

pursuant to the E-mail Agreement.  Tr. at 72, line 6 to p. 73, line 1.

31. Effective June 17, 2005, Lorie Harrell cancelled her Associate Agreement, which was held in the name of A-1 Marketing.  Plaintiff's Ex. 45; Tr. at 371, lines 11 to 22.

## D. Additional Evidence of Pre-Paid's Trade Secrets and its Protection of Such Secrets

32. Pre-Paid maintains an Associate Roster of confidential information in relation to its associates.  The Associate Roster contains the names, addresses, telephone numbers, and e-mail addresses of up to 450,000 Pre-Paid associates.  Additionally, the Associate Roster contains information concerning productivity and financial performance, including sales of products, recruitment of other associates, genealogy reports, and the associates' "upline" and "downline" relationships.  Information in the Associate Roster is important and confidential to Pre-Paid, and has been compiled at substantial expense over years of operation. Tr. at 256, line 19 to p. 258, line 12.

33. Les and Lorie Harrell signed, both individually and as an RVP of Pre-Paid, Area Coordinator Agreements in which they acknowledged that the identities and successes of sales associates are trade secrets.  Plaintiff's Ex. 110, at ¶7.  Les Harrell signed an Area Coordinator Agreement as an Area Coordinator.  Tr. at 511, lines 6 to 8.  Lorie Harrell signed Area Coordinator Agreements for other associates in her region as an RVP of Pre-Paid. Plaintiff's Ex. 110; Tr. at p. 384, lines 13 to 23.

34. Under an Area Coordinator Agreement, an Area Coordinator agrees not to disclose or to disseminate trade secrets during the agreement "or at any time thereafter," and the Area Coordinator cannot use the identities and addresses of Pre-Paid associates "in any manner" after the agreement is terminated.  Plaintiff's Ex. 110, at ¶¶ 7-8.  An Area Coordinator further agrees to the "Immediate return" of all listings of names and contact information for Pre-Paid associates.  Id. at ¶8.  The Area Coordinator Agreement specifically provides:

> [I]f you have placed Associates' names on an e-mail listing contained in your computer, that too must be returned to the Company and not to be used by you in any way.  As you know from your Associate Agreement, this information, whether in a list, in your memory or otherwise prepared, constitutes the trade secret information of the Company and may not be used by you for purposes other than promoting the business of Pre-Paid Legal Services, Inc. under applicable agreements and the law.

Id.

35.  Further, every time a Pre-Paid associate accesses reports on the Internet, he or she must click "I agree" that: (1) the report may only be used to assist in building and working his or her organization with Pre-Paid; (2) the information in the report may not be disclosed, transferred, sold or provided to any other person or company for any purpose; and (3) any unauthorized use or disclosure of the report constitutes a misappropriation of a confidential trade secret of Pre-Paid.  Tr. at 56, line 21 to p. 57, line 4; p. 309, line 12 to p. 311, line 10. This "I agree" confidentiality computer screen was in use when the Harrells were with Pre-Paid.  Tr. at 339, line 25 to p. 340, line 12.

36.  Pre-Paid maintains secure access to its building and institutes cease and desist letters.  Tr. at 57, lines 4 to 10.  Pre-Paid has also filed enforcement actions against former associates who have misappropriated trade secrets and/or violated the non-solicitation provisions in the RVP Agreements, which have resulted in agreed injunctions.  Id. at 57, lines 7 to 10.

37. Defendants' witness Eric Worre, a former marketing consultant with Pre-Paid, testified that he signed at least three agreements with Pre-Paid in which he agreed that the identities and successes of Pre-Paid sales associates were trade secrets and confidential. Plaintiff's Rebuttal Ex. 1 and 2; Defendants' Ex. 7, at ¶1.7; Tr. at 640, lines 13 to 19; p. 726, line 17 to p. 731, line 1; p. 736, line 21 to p. 738, line 17.

## E. Evidence of Defendants' solicitation of Pre-Paid Associates and Misappropriation of Trade Secrets

38. Les Harrell testified at trial that he worked briefly in the fall of 2003 for Positive Return, another multi-level marketing company. While he was at Positive Return, Les Harrell solicited Pre-Paid associate Tara Grunsenbach. Tr. at 513, line 18 to p. 514, line 14.

39. Les Harrell also stated in his deposition that he solicited Pre-Paid associate Larry Smith while at Positive Return. Tr. at 514, line 18 to p. 515, line 12. Les Harrell testified that he merely talked to Larry Smith and did not solicit him. Id. at 515, lines 13 to 22.

40. After Les Harrell joined Agel, he solicited a Pre-Paid associate, Pete Kowanko, to join Agel. Tr. at 516, lines 14 to 15; p. 516, line 24 to p. 517, line 11. Les Harrell sponsored Pete Kowanko at Agel. Id. at 517, lines 8 to 11.

41. On June 3, 2005, Lorie Harrell e-mailed a solicitation for Agel to Steven Bratcher, a Pre-Paid associate. Plaintiff's Ex. 44.

42. In June 2005, both Les and Lorie Harrell solicited Dave Hall to join Agel. Hall testified about the "full court press" the Harrells and other Agel representatives put on him to join Agel during his visit to the Agel corporate office. Tr. at 325, lines 8 to 9. Lorie Harrell contacted Hall by telephone and helped to arrange Hall's visit to Agel's corporate office on June 6, 2005. Id. at 315, line 6 to p. 317, line 19. Hall testified that during his three-hour visit to Agel, the Harrells, Eric Worre and other Agel representatives showed him the amount of money he could anticipate earning, showed him his proposed upline and downline in the organization, and were then careful to arrange his departure from the Agel office so that another Pre-Paid associate who was entering the office would not see him. Id. at 317, line 23 to p. 327, line 4.

43. On June 20, 2005, Lorie Harrell sent an e-mail solicitation to Susan Branch and Ken Law-Davis. Plaintiff's Ex. 47; Tr. at 405, line 24 to p. 406, line 2. The same day, Lorie Harrell sent an e-mail solicitation to Sean Matteson. Plaintiff's Ex. 48; Tr. at 501, lines 18 to 20.

44. On September 12, 2005, Lorie Harrell sent similar e-mail solicitations to Pre-Paid associates Patrick McBride (Plaintiff's Ex. 51) and Jan Tinder (Plaintiff's Ex. 53), and she sent a second e-mail solicitation to Sean Matteson (Plaintiff's Ex. 55). Tr. at 409, line 21 to p. 410, line 7; p. 416, lines 13 to 21; p. 501, lines 9 to 23.

45. In the September 12, 2005 e-mail solicitations, Lorie Harrell targeted Pre-Paid associates. The text of the e-mail refers to Eric Worre and states, "[y]ou may also remember him from his corporate training days at PPL." Plaintiff's Ex. 55. This statement addresses Pre-Paid associates who attended training sessions at Pre-Paid. The e-mail also states Eric Worre "has made over $1 million a year for ten years as a distributor." Id. Eric Worre testified at trial that statement was false. Tr. at 751, lines 11 to 14.

46. Pre-Paid sent a demand letter, dated September 8, 2005, to the Harrells. Plaintiff's Ex. 50. The letter to the Harrells demanded that they cease any solicitation and/or interference with Pre-Paid employees, associates, or independent contractors. Id.

47. Lorie Harrell continued to solicit Pre-Paid associates even after the Harrells received the demand letter. On November 10, 2005, Lorie Harrell contacted Pre-Paid associate Hashim Malik-Bey by telephone to recruit him to Agel. Plaintiff's Ex. 60. Malik-Bey did not know Lorie Harrell. Id.

48. On January 26, 2006, Lorie Harrell sent an e-mail to Pre-Paid associate Joe Dameron, soliciting him to Agel. Plaintiff's Ex. 63.

49. Les and Lorie Harrell also admitted at trial that they recently recruited Rodney and Deb Howell, who were Pre-Paid associates at the time, to join Agel. Tr. at 420, line 16 to p. 421, line 11; p. 517, lines 15 to 20.


F. Evidence of Defendants' Waiver of Certain Agreements

50. In their Supplemental Trial Brief filed May 25, 2007 (Dkt.# 104), Defendants argued for the first time the affirmative defense that the RVP Agreements' non-solicitation

clause is not legally enforceable. Defendants did not assert this affirmative defense until the Friday before the week of trial. Defendants did not assert this affirmative defense in their answer, amended answer, deposition testimony or any previous filing — including all previous Pretrial Order submissions and previously proposed jury instructions.

51. Similarly, in their Motion in Limine filed May 1, 2007, Defendants for the first time attempted to invoke the arbitration provision in the RVP Agreements. See Dkt.# 80. Prior to this assertion, Defendants had actively and extensively litigated the case. The Harrells engaged in extensive discovery, filed counterclaims against Pre-Paid and Harland Stonecipher, never sought a stay of the proceedings, and waited until the filing date of the proposed Pretrial Order to notify Pre-Paid and this Court of any interest in arbitration. Through their actions, Defendants accepted this Court as the proper forum to litigate their claims.

G. General Findings

52. The Court does not find Lorie Harrell's testimony to be credible for the following reasons:

a. Lorie Harrell's testimony was not credible when she denied that Plaintiff's Exhibits 44, 47 and 48 were even indirect solicitations for Pre-Paid associates to join Agel. Tr. at p. 403, line 23 to p. 407, line 1.

b. While Lorie Harrell admitted that Plaintiff's Exhibit 51 was clearly a direct solicitation to join Agel, she denied that the solicitation was specifically targeted to Pre-Paid associates, even though the e-mail described Worre by "his corporate training days at PPL." Tr. at p. 409, line 21 to p. 410, line 3; p. 415, line 7 to p. 416, line 4.

c. The demand letter from Pre-Paid was signed for and received by the Harrells on September 19, 2005. Plaintiff's Exhibit 111. Lorie Harrell testified that she did not sign for or recall receiving the demand letter, though the signature on the certified mail receipt closely resembles her signature on Pre-Paid contracts. Plaintiff's Exhibit 110 and 111. Tr. at p. 417, line 11 to p. 418, line 24.

d. Lorie Harrell testified that she complied with the January 7, 2004 letter from Pre-Paid, which asked her to return all confidential materials to the company in compliance with Paragraph 9.1 of her RVP Agreement. Plaintiff's Ex. 12, at ¶9.1; Plaintiff's Exhibit 15; Tr. at p. 455, line 8 to p. 458, line 4. Despite the RVP Agreement provision which required her to return or destroy all confidential materials, Harrell admitted that she (1) retained a copy of an alleged RVP manual (but only produced, at trial, one page of the purported manual), and (2) did not delete e-mail contacts of Pre-Paid associates when she left. Tr. at p. 502, line 15 to p. 504, line 5.

53. Defendants sent e-mail solicitations to Pre-Paid associates on multiple dates, and even sent multiple e-mails to the same Pre-Paid associates to solicit them to work for Agel. Plaintiff's Ex. 44, 48, 51, 53, 55, 60 and 63; Tr. at 501, lines 18 to 20; Tr. at 409, line 21 to p. 410, line 7; p. 416, lines 13 to 21; p. 501, lines 9 to 23.

54. The Harrells accessed Pre-Paid's Associate Roster to obtain confidential information about associates' contact information, productivity, performance, genealogy reports, and "upline" and "downline" relationships. Proposed Findings of Fact 38-49, 52-53.

55. The Harrells systematically and intentionally used Pre-Paid's Associate Roster and related financial and identifying information to specifically target high-level and successful Pre-Paid associates to join Agel. The Harrells misappropriated that confidential information, using it without authorization and contrary to the terms of contractual agreements with Pre-Paid. Proposed Findings of Fact 38-49, 52-54.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction to hear this matter for injunctive relief. Defendants waived any right to seek arbitration under the RVP Agreements. Further, the arbitration provision cited by Defendants does not apply to a claim for injunctive relief, which may be heard by this Court under the express terms of Paragraph 11 of the Harrells' RVP Agreements. Plaintiff's Exhibit 9, at ¶11.

2. Lorie Harrell created a valid agreement with Pre-Paid on September 7, 2004, when she responded by e-mail and stated "I am in agreement" with the terms of Keri Prince's e-mail offer. E-mails between parties satisfy the writing and signature requirements of the statute of frauds. *See, e.g. Cloud Corp. v. Hasbro, Inc., 314 F.3d 289, 295-96 (7th Cir. 2002); Roger Edwards, L.L.C. v. Fiddes & Son, Ltd., 245 F.Supp. 251, 261 (D.Me. 2003); see also, 15 U.S.C. §7001(a)( "[A] signature, contract, or other record relating to [a] transaction may not be denied legal effect, validity or enforceability solely because it is in electronic form.").*

3. Defendants waived the right to assert the affirmative defense that the non-solicitation clause in the RVP Agreements is unenforceable as a matter of law. Fed.R.Civ.P. 8(c). Nevertheless, the non-solicitation clause in the RVP Agreements is valid under both Texas and Oklahoma law because the clause is a reasonable covenant under Texas law and not subject to the Oklahoma statute that voids contracts in restraint of trade

4. The non-solicitation clause in the RVP Agreements satisfies the criteria set forth under Texas statutory law for a valid covenant not to compete:

> [A] covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

Tex.Bus. & Com.Code §15.50.

5. First, the RVP Agreement is "an otherwise enforceable agreement" supported by adequate consideration. In each RVP Agreement, Pre-Paid and Les or Lorie Harrell agreed to binding, non-illusory promises. Pre-Paid agreed to disclose confidential information and trade secrets, and the employee consented to non-disclosure and non-competition provisions and agreed to return or destroy all confidential materials upon termination; both parties also agreed to arbitrate disputes related to the agreements. See Plaintiff's Exhibit 9, at ¶¶9-10; Plaintiff's Exhibit 12, at ¶¶ 9-10, *see also Alex Sheshunoff Mgt. Servs., L.P. v. Johnson, 209*

*S.W.3d 644, 649-51 (Tex. 2006)(holding that an agreement in which an employer promises to disclose confidential information, and the employee agrees not to disclose confidential information, was enforceable); Guy Carpenter & Co., Inc. v. Provenzale, 334 F.3d 459, 465 (5th Cir. 2003)(treating non-disclosure and non-solicitation covenants and an arbitration provision as non-illusory promises in an at-will employment agreement); Beasley v. Hub City Texas, L.P. 2003 WL 22254692, at \*5 (Tex. App. Sept. 29, 2003)(finding an "otherwise enforceable agreement" where, under the terms of a non-competition covenant, the employee "will be granted otherwise prohibited access to confidential and proprietary data" of the employer, in exchange for the employee's promise not to divulge or use the information).*

6. Second, the non-solicitation clause was "ancillary to or part of" the enforceable RVP Agreements between Pre-Paid and the Harrells. Pre-Paid's promise to provide confidential information to the Harrells gave rise to its interest in preventing the Harrells from soliciting Pre-Paid's associates and disclosing trade secrets; the non-solicitation clause helps to enforce these objectives. *See Light v. Centel Cellular Co. of Texas, 883 S.W.2d 642, 647 n.14 (Tex. 1994)(noting that "if an employer gives an employee confidential and proprietary information or trade secrets in exchange for the employee's promise not to disclose them, and the parties enter into a covenant not to compete, the covenant is ancillary to an otherwise enforceable agreement.").*

7. Third, the non-solicitation provision in the RVP Agreements is enforceable under Texas law because any limitations are reasonable. The RVP Agreements give rise to an "interest worthy of protection" with the non-solicitation provision, as "confidential or proprietary information are examples of such worthy interests." *Alex Sheshunoff Mgmt. Servs., 209 S.W.3d at 649.* The non-solicitation clause protects Pre-Paid's interests in the non-disclosure of its trade secrets and retention of its employees and associates. In signing the RVP Agreements, the Harrells also acknowledged the reasonableness of the non-solicitation provisions. Plaintiff's Exhibit 9, at ¶12; Plaintiff's Exhibit 12, at ¶12.

8. The non-solicitation clause in the RVP Agreements is also enforceable under Oklahoma law. The clause is not a restraint of trade as that term is defined in Okla. Stat. tit.

15, §217. The clause does not relate to or involve competition with Pre-Paid and does not prevent the Harrells from exercising any lawful profession. Further, the non-solicitation clause does not impose undue hardship on the Harrells.

9. Pre-Paid is entitled to injunctive relief against Les and Lorie Harrell based on Oklahoma's Uniform Trade Secrets Act ("UTSA"), Okla. Stat. tit. 78, §87(A) and the contractual provisions of the Harrells' agreements with Pre-Paid.

10. A violation of the UTSA can be remedied through injunctive relief. Id.

11. In order to prevail on a claim under Oklahoma's UTSA, Pre-Paid must prove by a preponderance of the evidence (1) the existence of a trade secret; (2) misappropriation of the secrets by the defendants; and (3) use of the secrets by the defendants to the plaintiff's detriment. *See Okla. Stat. tit. 78, §86 et seq.; Micro Consulting, Inc. v. Zubeldia, 813 F.Supp. 1514, 1534 (W.D. Okla. 1990).*

12. Oklahoma's UTSA defines "trade secret" as:

> Information, including a formula, pattern, compilation, program device, method, technique or process, that:
>
> (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and
>
> (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Okla. Stat. tit. 78, §86(4).

13. Courts have held that, under the UTSA, "[a] broad range of business data and facts which, if kept secret, provide the holder with an economic advantage over competitors or others, qualify as trade secrets." *Econ. Roofing & Insulating v. Zumarlis, 538 N.W.2d 641, 647 (Iowa 1995)(interpreting a UTSA provision identical to that adopted in Oklahoma). "There is virtually no category of information that cannot, as long as the information is protected from disclosure to the public, constitute a trade secret." Id.*

14. Pre-Paid's Associate Roster and related financial and identifying information of associates constitute a trade secret. "As a general principle, the more difficult information is to obtain, and the more time and resources expended by an employer in gathering it, the more likely a court will find such information constitutes a trade secret." *Morlife, Inc. v. Perry, 66 Cal.Rptr.2d 731, 736 (Cal.Ct.App. 1997).*

15. Dave Hall testified that the identity of successful Pre-Paid associates is "absolutely critical information to be protected." Tr. at p. 305, lines 12 to 13. A primary source of income for Pre-Paid associates is their genealogy — those involved in the associate's organization. Knowledge of successful associates would therefore be very valuable to a competitor. Id. at p. 305, line 11 to p. 307, line 14.

16. The fact a small portion of the information that forms Pre-Paid's trade secret Associate Roster was publicly available in an uncompiled manner (such as a particular associate's name or phone number in a phone book) does not disqualify it from being a trade secret. *See, e.g., Capital Asset Research Corp. v. Finnegan, 160 F.3d 683, 686 (11th Cir. 1998)("Even if all of the information is publicly available, a unique compilation of that information, which adds value to the information, also may qualify as a trade secret."); Rivendall Forest Prods. Ltd. v. Georgia-Pacific Corp., 28 F.3d 1042, 1046 (10th Cir. 1994)(concluding that "a trade secret can include a system where the elements are in the public domain, but there has been accomplished an effective, successful and valuable integration of the public domain elements and the trade secret gave the claimant a competitive advantage which is protected from misappropriation.").*

17. Confidentiality agreements provide evidence of reasonable efforts to maintain secrecy. *MAI Sys. Corp. v. Peak Computer, Inc., 991 F.2d 511, 521 (9th Cir. 1993); Hexacomb Corp. v. GTW Enters., Inc., 875 F.Supp. 457, 463 (N.D. Ill. 1993).*

18. Les and Lorie Harrell signed RVP Agreements that acknowledged the identities and success of Pre-Paid associates are trade secrets and confidential, and required the Harrells not to use that information — during employment as an RVP "or at any time thereafter" —

for any purpose other than Pre-Paid business. Plaintiff's Exhibit 9, at ¶9; Plaintiff's Exhibit 12, at ¶9. Les and Lorie Harrell signed Associate Agreements whereby they acknowledged that the names of Pre-Paid associates were trade secrets. See Plaintiff's Exhibit 2, Policies and Procedures, at ¶11 (c). Les and Lorie Harrell also signed Area Coordinator Agreements acknowledging that the identities and successes of Pre-Paid associates are trade secrets. See Plaintiff's Exhibit 110, at ¶7. These contractual provisions provide evidence of Pre-Paid's efforts to maintain secrecy of its trade secrets and that Pre-Paid has taken reasonable steps to protect its trade secrets.

19. Pre-Paid has taken additional steps to protect its trade secrets through (1) the requirement that each associate agree to a confidentiality provision before accessing Pre-Paid reports online; (2) maintenance of secured access to Pre-Paid buildings; and (3) cease and desist letters and enforcement actions against former associates who have misappropriated trade secrets or violated non-solicitation provisions.

20. Oklahoma's UTSA defines "misappropriation" as follows:

> Disclosure or use of a trade secret of another without express or implied consent by a person who . . .at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use . . .

Okla. Stat. tit. 78, §86(2)(b)(2)(b).

21. Pre-Paid presented evidence at trial to establish "acquisition by a person who is privileged to the information by reason of some special relationship and unauthorized use of the same." *Micro Consulting, Inc., 813 F.Supp. at 1535*.

22. The Harrells used the trade secrets to the detriment of Pre-Paid. Pre-Paid associates solicited by the Harrells expressed concern about the Harrells' access to their downline reports and Pre-Paid's protection of their confidential information. Tr. at p. 191, line 21 to p. 194, line 19. Further, Harland Stonecipher, President and the Chief Executive Officer of Pre-Paid, testified about the impact of Defendants' solicitations on Pre-Paid's associates. The solicitations interfered substantially with Pre-Paid's marketing force and required significant

time of salaried employees to respond to associates' concerns regarding the solicitations.  Id. at p. 536, line 5 to p. 540, line 13.

23.  Defendants introduced no evidence to support application of the alleged 90-day probationary period to any pertinent RVP Agreement.  No evidence indicated the Defendants' sole page of an unidentified, unproduced RVP manual applied specifically to the Harrells' RVP Agreements.

24. The RVP Agreements do not incorporate terms from any RVP manual.  The RVP Agreements include an integration clause, providing that the terms of each RVP Agreement "constitute[] the entire agreement of the parties."  Plaintiff's Exhibit 9, at ¶16; Plaintiff's Exhibit 12, at ¶16.

25. Evidence at trial was undisputed that Lorie Harrell worked more than 90 days as a Pre-Paid RVP.  See Plaintiff's Exhibit 15.  Because Lorie Harrell worked longer than 90 days, any dispute about the "effective date" of her resignation from Pre-Paid is irrelevant.

26. Pre-Paid first sought injunctive relief on November 9, 2005, when it filed its state-court petition, which was later removed to this Court.  The Harrells have continued to violate the non-solicitation clause during the pendency of this litigation.  The cumulative and ongoing nature of Defendants' solicitation indicates Defendants should be permanently enjoined from misappropriating Pre-Paid's trade secrets.

27. A "general principle" under the UTSA "is that an injunction should last as long as is necessary, but no longer than necessary, to eliminate the commercial advantage or 'lead time' with respect to good faith competitors that a person has obtained through misappropriation." *Unif. Trade Secrets Act §2 cmt., 14 U.L.A. 449, 450 (1985); see also K-2 Ski Co. v. Head Ski Co., 506 F.2d 471, 474 (9th Cir. 1974)(limiting an injunction's duration to a period required by good faith competitors to develop the trade secret information by legitimate means); Analogic Corp. v. Data Translations, Inc., 358 N.E.2d 804, 808 (Mass. 1976)(holding that a plaintiff was entitled to injunctive relief until others became aware of the trade secret by legitimate means).*

28. In the instant case, the Harrells could never replicate or obtain by legitimate means an Associate Roster or the identities, productivity data, financial performance, genealogy reports, and upline and downline relationships of Pre-Paid's associates. Pre-Paid has compiled this confidential information at substantial expense over years of operation. Tr. at p. 256, line 19, to p. 258, line 12.

29. Because the Harrells could never develop Pre-Paid's trade secrets by lawful means and could have only learned such confidential information from their Pre-Paid affiliation, Pre-Paid is entitled to a permanent injunction to bar the Harrells from misappropriating these trade secrets.

30. In analogous contexts, courts have granted permanent injunctive relief to a former employer barring a former employee from misappropriating trade secrets regarding the former employer's confidential customer information. *See, e.g., Zoecon Indus. v. Am. Stockman Tag Co., 713 F.2d 1174, 1180 (5th Cir. 1983)(upholding a district court's grant of a permanent injunction barring a former employee from using confidential customer information acquired from a former employer); Pac. Aerospace & Elecs., Inc. v. Taylor, 295 F.Supp.2d 1205, 1219-20 (E.D. Wash. 2003)(granting a permanent injunction to a former employer barring former employees from using former employer's confidential customer information to contact and solicit former employer's customers).*

31. Evidence at trial established that the Harrells not only violated Oklahoma's trade secret law, but also violated their contractual agreements with Pre-Paid.

32. Defendants are permanently enjoined from violating the confidentiality/trade secret provisions in their RVP Agreements.

33. In signing their RVP Agreements, Les and Lorie Harrell agreed not to "directly or indirectly, at any time during this Agreement or at any time thereafter disclose or disseminate to anyone" confidential materials of Pre-Paid for any purpose other than Pre-Paid's business. Plaintiff's Exhibit 9, at ¶9; Plaintiff's Exhibit 12, at ¶9.

34. Under the trade secrets provision in the RVP Agreements, Defendants agreed to

never disclose trade secrets of Pre-Paid unless the disclosure was in connection with Pre-Paid's business. The Agreements provided no time frame after which Defendants could begin to disclose Pre-Paid's confidential information or to use those trade secrets for purposes other than Pre-Paid's business.

35. Pre-Paid also established at trial that the Harrells violated on multiple occasions the respective non-solicitation provisions in their RVP Agreements. These identical provisions prohibited the Harrells — for three years after termination of each agreement — from directly or indirectly soliciting Pre-Paid associates or taking any action which would cause the termination or curtailment of the business relationship between Pre-Paid and its associates. Plaintiff's Exhibit 9, at ¶10; Plaintiff's Exhibit 12, at ¶10.

36. Lorie Harrell remained obligated not to solicit Pre-Paid associates under the terms of her E-mail Agreement until September 7, 2007. Under that agreement, she agreed to a three-year non-solicitation provision.

37. Lorie Harrell resigned from Pre-Paid on January 7, 2004, and her three-year non-solicitation period under the RVP Agreement extended until January 7, 2007. Les Harrell terminated his RVP Agreement sometime in June 2003, and the three-year non-solicitation period expired in June 2006. Tr. at p. 401, lines 21 to 22; p. 440, lines 14 to 19; p. 444, lines 7 to 9; p. 512, lines 7 to 9.

38. Because Pre-Paid has never received the benefit of any of these non-solicitation provisions, Pre-Paid is entitled to three years of prospective injunctive relief to bar the Harrells' solicitation of Pre-Paid's associates, beginning on the date of this Court's judgment. The Tenth Circuit has held that a district court may issue prospective injunctive relief based on its plenary power and inherent power to do equity. *See, e.g., Kodekey Elecs., Inc. v. Mechanex Corp., 500 F.2d 110, 112-13 (10th Cir. 1974).*

39. The Harrells should not be able to benefit from their breaches of these non-solicitation provisions by forcing Pre-Paid to seek injunctive relief through litigation that has extended beyond the three-year periods. The non-solicitation provisions are not necessarily

moot merely because the three-year non-solicitation periods have now expired. A finding of mootness would reward the Harrells' breach of the non-solicitation provisions. *See, Roanoke Engineering Sales Co. v. Rosenbaum, 290 S.E.2d 882 (Va. 1982)(under similar facts holding a finding of mootness would "render the judicial system impotent to redress" the profits of the former employee's breach); see also Capelouto v. Orkin Exterminating Co., 183 So.2d 532, 534-35 (Fla. 1966)(affirming trial court's order of two years of prospective injunctive relief because the employee had been in competition with the employer since his termination and "this was the only way to give [the employer] its two competition-free years" under the prior agreement.).*

**IT IS SO ORDERED this 8th day of January 2008.**

James H. Payne
United States District Judge
Eastern District of Oklahoma